**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BALANCECXI, INC. d/b/a ZACOUSTIC** | § | |
| | § | |
| **V.** | § | **1:19-CV-0767-RP** |
| | § | |
| **INTERNATIONAL CONSULTING and** | § | |
| **RESEARCH GROUP, LLC, et al.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE ROBERT PITMAN
      UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiff BalanceCXI, Inc. d/b/a Zacoustic's Motion for Rule 37(b) Discovery Sanctions (Dkt. No. 66) and the associated responses and replies. The District Court referred the Motion to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72, and Rule 1(c) of Appendix C of the Local Rules. The Court held a hearing on the motion on June 3 and 4, 2020.

## I. Introduction

This is a non-competition and theft of trade secrets suit. Defendants Christopher DeSimone and Adam Oldfield are former employees of software development company BalanceCXI, and are the principals of International Consulting and Research Group, LLC ("ICAR"). Their employment with BalanceCXI ended on January 15, 2019. Roughly four months later, on April 5, 2019, BalanceCXI's counsel requested that DeSimone and Oldfield return their company laptops. The letter specifically directed that they not copy or alter any of the data on their computers. BalanceCXI alleges that immediately after the request to return their laptops, DeSimone and Oldfield transferred BalanceCXI's confidential information and trade secrets from those laptops to storage devices, and

then launched specialized software to delete hundreds of thousands of files and folders on the computers, to hide (or at least obscure) what precisely they had copied.  BalanceCXI sues DeSimone, Oldfield and ICAR for misappropriating its confidential information and trade secrets, and violating non-compte and non-solicitation agreements. In the motion before the Court, BalanceCXI asks the Court to enter sanctions against the Defendants for their actions in deleting electronically stored information.

## II. Background

This history of the Defendants' production of their computers and electronic storage media is long and complicated.  The undersigned's first involvement with the case related to a motion BalanceCXI filed nearly a year ago asking the Court to compel the Defendants to produce records and information.  Dkt. No. 12. In it, BalanceCXI alleged it had spent several months unsuccessfully trying to negotiate the voluntary return of the material copied or deleted from the laptops, so it served written discovery on Defendants seeking in part to inspect additional devices and computers. BalanceCXI complained in the motion that the Defendants failed to produce any documents with their responses, and did not verify their interrogatory answers. BalanceCXI sought an order compelling production and an award of fees and costs. After much back and forth on unrelated matters regarding the Defendants' attorney's ability to respond and his request for permission to supplement his briefing, the Court finally held a hearing on the motion on March 5, 2020.  The Court issued rulings from the bench, and filed a written order memorializing its rulings.  Dkt. No. 46.

Among other things, the order addressed the need for the Defendants to act with a great deal more candor than they had.  The Court remarked that though it appeared there were more storage

devices that would be need to be produced, because those devices had not yet been specifically identified, it

> could not order the production of yet unidentified electronic devices. However, the Court **NOTIFIES** the Defendants that to the extent the forensic examination of electronic devices reveals that other devices may have been involved in the transmission, storage, or alteration of BalanceCXI's data that was contained on the company laptops, actions taken to impede or delay the production of those devices will not be tolerated. The Defendants dug themselves a deep hole through their actions immediately prior to returning their laptops, and if they wish to avoid making that hole deeper, the Court strongly recommends that the Defendants unfailingly comply with their discovery obligations moving forward. Failure to do so will result in the Court imposing monetary, and perhaps other, sanctions against them.

Dkt. No. 46 at 6-7. The Court also reserved for later the issue of attorney's fees and costs related to the motion, and directed BalanceCXI to notify the Court once it had received the supplemental production the Court was ordering, and the "Court will at that time issue a schedule for any additional briefing on the issue the parties may wish to submit." *Id.* at 9.

Notwithstanding that the Court asked *BalanceCXI* to notify it when the discovery was complete, Defendants thereafter filed what BalanceCXI terms a "preemptive" advisory. Claiming that they had largely complied with the directives in the Court's order, Defendants stated:

> On March 28, 2020, Defendant Oldfield served his 2nd Amended Interrogatory Responses, to address the whereabouts of devices to which R3 Forensics detected his external storage drive had been attached prior to production of such storage device to Plaintiff. While the information provided by Oldfield was not responsive to BalanceCXI's Interrogatory No. 1, nor the Court's Order, nor the parties' Rule 29 Device Production Protocol (Dkt. No. 19), he nevertheless provided extensive detail on the whereabouts of such non-responsive devices. Therefore, the information was provided in good faith to resolve that open question for BalanceCXI.

Dkt. No. 56 at 2. Defendants further asserted that they were concerned that BalanceCXI might identify Oldfield's current laptop—which he acquired a month or so after returning the company-issued laptop—as yet another device it needed to examine, and complained such a request would be

excessive, since the new laptop had never been connected to his company laptop.  Defendants made several other claims in the advisory, denying that they had taken BalanceCXI's source code and claiming that BalanceCXI had not been harmed by any of their actions, since DeSimone and Oldfield had returned their computers with all company files intact.  They also asserted that BalanceCXI had held Defendants' storage devices longer than permitted by the parties' agreed protocol. Dkt. No. 56 at 3-8.  BalanceCXI's brief response noted its disagreement with much of what the Defendants claimed, and stated that it would file a complete report soon.  Dkt. No. 57 at 2.

Two weeks later, BalanceCXI filed a 16-page advisory, accompanied by 18 exhibits, outlining the deficiencies it found in Defendants' discovery responses.  Dkt. No. 62.  The advisory stated that the forensic review of Oldfield and DeSimone's laptops showed they had been connected to at least five separate devices in the day or two prior to their return.  Though BalanceCXI had requested all five devices be produced for inspection, Defendants had only turned over two: a Western Digital hard drive and a Lexar flash drive, and claimed they either misplaced or discarded the remaining devices.  Dkt. No. 62 at 3-6. BalanceCXI further noted that the forensic investigation identified yet another device—another Western Digital hard drive—that had also been connected to Oldfield's laptop and yet had not been disclosed.  Moreover, it stated that its forensic examination of the two external drives the Defendants *did* produce showed that they were subsequently connected to multiple *additional* computers and devices, none of which the Defendants had disclosed in response to the discovery requests.  One of these additional, undisclosed devices was Oldfield's current laptop.  The advisory criticized the Defendants for failing to heed the Court's warning that they be forthcoming with any additional devices, and noted that the devices Defendants did produce only exacerbated things, as they showed further evidence of misconduct.  BalanceCXI specifically

4

contended that, from the forensic review of the computers and devices, it appeared that the Defendants did in fact copy BalanceCXI's source code, along with other proprietary information, and took extreme measures to hide their actions, including the wholesale wiping of drives or portions of them immediately before their production. The advisory also asked the Court to sanction the Defendants. Dkt. No. 62 at 5.

In response, the Court directed BalanceCXI that if it sought sanctions for the conduct set out in its advisory, it needed to make a specific request for it. Dkt. No. 65. BalanceCXI did so two days later with the motion now under consideration. Dkt. No. 66.

### III. Fact Findings

The evidentiary hearing on BalanceCXI's motion spanned two days and involved testimony from three live witnesses, a number of declarations and depositions, and nearly 50 exhibits.[1]  From this, the Court makes the following factual findings.

- BalanceCXI operates under the trade name "Zacoustic." On its website it states that "Zacoustic is an innovative customer experience management big data and analytics Software-as-a-Service (SaaS) tool." *See* https://www.zacoustic.com/about-us/ (last visited Nov. 6, 2020). Thus, "Zacoustic" refers to both the company, and its SaaS tool, or software.

- DeSimone first worked with Zacoustic (indirectly) in 2016. This occurred while he was employed by ICAR, which had been hired to manage a beta test of Zacoustic software for an ICAR client that was also a Zacoustic customer. Thereafter, BalanceCXI hired DeSimone and ICAR to provide it with general strategy and product consulting services. Dkt. No. 12-2 at ¶ 5.

- On January 1, 2018, DeSimone was hired to be BalanceCXI's Chief Operating Officer. During his employment he was provided with a company-owned laptop computer.

---

[1]Because of the pandemic, the hearing took place via the Zoom platform.

- BalanceCXI hired Adam Oldfield on March 3, 2017, as a Senior Software Engineer. Dkt. No. 12-2 at ¶ 6.  He was promoted to Vice President of Technology a year later, and to Chief Technology Officer on January 1, 2019.  He too was provided with a company-owned laptop.

- Both DeSimone and Oldfield executed Non-Compete and Non-Solicitation Agreements.  Dkt. Nos. 76-6 & 7.  Each also acknowledged receipt of an employee handbook, which, among many other things, included the following:

  > "Worksite employees must return any company equipment, materials or Confidential Information in their possession upon termination of employment or immediately upon any request by the company."

  > "All information created, sent, received, or stored on the company's electronic resources is company property. Such information is not the private property of any worksite employee and worksite employees should have no expectation of privacy in the use or contents of the company's electronic resources."

  Dkt. No. 83-8 at 2, 5.

- On January 15, 2019, DeSimone's and Oldfield's employment with BalanceCXI ended.  They characterize the termination of their employment as a "firing."  The parting of ways was acrimonious, and at the time of their firing, DeSimone and Oldfield contended that they were entitled to compensation or other benefits that they had not received.

- After leaving BalanceCXI, DeSimone eventually resumed working through ICAR, and Oldfield joined him there as well.  DeSimone is ICAR's sole managing member and Oldfield is an employee.  Dkt. 30-2 at 1. At the March 2020 hearing on the motion to compel, they represented that they were working on an ETL ("extract, transform and load") software project for a customer in the airline industry.  Dkt. 47 at 28; *see also* Dkt. No. 30-2 at 1.

- DeSimone and Oldfield retained their laptops after they left BalanceCXI, and continued to use them for personal and other purposes.  Dkt. No. 83-36 at 61.

- On April 5, 2019, BalanceCXI, through counsel, (David Whittlesey of Shearman & Sterling LLP) sent a letter to DeSimone and Oldfield, requesting return of the company computers.  The letter stated that "we have been advised that this computer contains a significant amount of confidential information and other intellectual property belonging to BalanceCXI, including but not limited to the Company's source code."  Dkt. No. 83-13.

6

- The letter expressly instructed DeSimone and Oldfield not to make any changes to the computers before returning them: "You must refrain from deleting or modifying any programs, data or files on the above-referenced laptop computer, as these actions constitute not only spoliation of evidence but also destruction of Company property. You must further refrain from making copies of any source code, files, programs, or other intellectual property stored on the computer." *Id.*

- On April 8, 2019, attorney Kerry O'Brien emailed Whittlesey and informed him that he had been hired to represent Oldfield and DeSimone. Dkt. No. 83-15 at 3.

- The next morning O'Brien emailed Whittlesey, stating he was "arranging for pickup by your courier for each clients' devices. Mr. Oldfield is just getting back into town and will need a bit to remove any personal files from his device (which did not travel with him) before it is ready for pickup. I'll be back to you shortly on this to arrange pick up times." Dkt. No. 83-14 at 3.  He also directed BalanceCXI to preserve the information on the laptops once they received them back, as that information could be relevant to "any potential formal legal dispute." *Id.*[2] Therefore, by this date, if not earlier, the parties anticipated litigation.

- Minutes later, Whittlesey responded, advising O'Brien "that your clients are not authorized to delete any files from the computers—whether he (or they) contends they are personal or otherwise. These are company laptops. Your clients are not authorized to delete any files. Please have the company's computers secured and delivered to me immediately without alteration." Dkt. No. 83-14 at 2.

- With regard to any personal data that was on the computers, Whittlesey offered that he would "maintain the computers in my possession and if there are personal files on the laptops, your clients can identify them for us and we can attempt to come up with a procedure to see that they are removed if they are truly personal in nature and bear no relationship to company matters." *Id.*

- Immediately thereafter, O'Brien emailed DeSimone and Oldfield, stating, "See — this is how the laptop/device issue gets touchy/messy from the outset, as the employer tries to 'weaponize' this issue from the get-go. If you have any lack of clarity about whether something is personal or not, let's discuss. I'm still advising that you remove your purely personal files and delete those. I would keep those files segregated in a file or something so that if necessary, we can later easily identify what files you removed." Dkt. No. 83-15 at 1.

---

[2]Throughout these early emails O'Brien inexplicably refers to Whittlesey's client as "RIT." The record is unclear if this was simply a mistake by O'Brien, or if "RIT" somehow refers to BalanceCXI.

- Later that afternoon, Whittlesey emailed O'Brien and "reiterate[d] our request that none of the data on the laptops be altered or deleted prior to their return to us." He repeated that all data on the laptops was the property of BalanceCXI, quoting the language from the BalanceCXI employee manual noted above (at p. 6). Dkt. No. 83-14 at 1.

- BalanceCXI's counsel received the Defendants' laptops on April 10, 2019.

- On April 30, 2019, DeSimone and Oldfield sued BalanceCXI in Texas state court for breach of contract, complaining that they had not been paid promised salary and other compensation.

- In June 2019, BalanceCXI hired R3 Digital Forensics to examine Oldfield and DeSimone's laptops. The examiner's first step was to do a quick review and create "Triage Reports" for each of the laptops. These were admitted at the hearing. Dkt. Nos. 83-2 and 83-3.

- The examination of Oldfield's laptop revealed that on January 15, 2019 (the last day of his employment with BalanceCXI), his "entire . . . email account was downloaded from Google servers to the Adam Download folder" created on the laptop. As the report notes, "[i]t is reasonable to believe the email archive was downloaded for the purpose of copying/exporting out of company control." Dkt. No. 83-2 at 1.

- At his deposition, Oldfield admitted that he had downloaded a copy of his entire email file to his laptop. "I exported all the contents of my e-mail, because I wanted access to those files to be able to establish my case against BalanceCXI and obtain the compensation that they had not paid me." Dkt. No. 83-36 at 89. He claimed he never accessed that export or copied those emails to another device because he located what he needed by accessing BalanceCXI's email online, as he could still log in. *Id.* at 93.

- The triage report also found that a "three terabyte Western Digital USB external hard drive was connected to this computer twice on April 9, 2019. Once at 10:26:08 AM and again at 01:15:08 PM." While connected to the drive, 17 folders were created on the external drive, in a root folder Oldfield gave the name "Z backup." The forensic exam identified 48 folders residing on the laptop C:/ drive that were accessed during the connection, including a "ZacousticRepo" file. Dkt. No. 83-2 at 1-2.

- The folders that Oldfield accessed while the Western Digital drive was connected included a number of folders that held BalanceCXI's software source code. Dkt. No. 62-8 at ¶¶ 7-8.

8

- Oldfield admitted that at the time he was copying files from the laptop to the Western Digital drive, BalanceCXI's source code was available on the laptop. Dkt. No. 83-36 at 125-26, 211-12. Oldfield's opening the folders noted in the forensic report at the same time that the drive was connected strongly suggests that he was copying data from these folders to the Western Digital drive at this time. Further, his accessing of the folders is inconsistent with his claim that his intent on April 9, 2019, was to remove personal information off of the computer. To be kind, his explanation for accessing the files (Dkt. No. 83-36 at 191-96) is completely lacking in credibility, and borders on the absurd at times.

- R3 also found that the "file wiping program CCleaner3 was [run on the laptop] on 04/09/2019 on or about 9:00 PM, approximately 8 hours after the Western Digital storage device's last known connection time. At least 266,283 files and folders were deleted and are not recoverable. It is not possible to determine what the deleted files' content was prior to deletion with CCleaner, any of which may have been Zacoustic intellectual property." Dkt. No. 83-2 at 2.

- In other words, it is entirely possible—indeed, it seems likely—that Oldfield copied BalanceCXI material, transferred those copies to the Western Digital drive, and then used CCleaner to wipe from the laptop all evidence of having done this.

- The situation is very similar with regard to DeSimone's laptop. The forensic examination showed that three USB storage devices had been connected to his computer on April 9, 2019. No. 83-3 at 1. These included a Samsung FIT storage device and a Lexar flash drive, both of which were connected at a time that coincides with the time files or folders were created or modified, "presenting a reasonable conclusion that files were copied to these devices while they were connected to this computer." *Id.* The examination reflected that three "ICAR" related sub-folders were copied to the Lexar flash drive while it was connected to this computer, and 42 folders from the laptop were accessed *after* the Samsung FIT drive was connected, meaning that DeSimone was browsing those 42 folders while the external drive was connected. Five sub-folders of the C:/Chris/Desktop/Zacousitc folder reflected "last modified times" after the FIT connect time, which means it is highly likely that all or some of their contents were copied to the FIT drive. *Id.*

- Finally, as did Oldfield, DeSimone ran CCleaner on his laptop at least 3 times on April 9, 2019, at 9:38 AM, 1:16 PM and 3:23 PM. Through this software, DeSimone permanently deleted at least 14,000 files and folders from the computer, wiping all evidence of what he deleted. Dkt. No. 83-3.

- Like Oldfield, DeSimone claimed that on April 9, 2019, his "intent was to copy personal files and then to delete them from the PC." Dkt. No. 83-37 at 84. He asserted that if "there are any Zacoustic related files [copied] they were either accidental copies that should have been deleted at the time, or files that might have

9

pre-existed from before." *Id.* He offered no credible explanation for why he was perusing non-personal, proprietary BalanceCXI data when his alleged purpose was only to remove personal data.  Like Oldfield, his explanation for his actions was lacking in credibility.

- Oldfield and DeSimone's use of CCleaner to wipe their tracks prevented the forensic examiner from being able to determine what data they copied from their laptops to the external devices. The examiner stated that to determine this, he would have to examine the external devices that had been connected to the laptops on April 9, 2019.

- After he received the forensic report on the two laptops, counsel for BalanceCXI sent a letter to Defendants' counsel, stating that BalanceCXI believed that DeSimone and Oldfield's actions demonstrated they had "misappropriated BalanceCXI's confidential information and trade secrets."  Dkt. No. 83-16.  Thus, BalanceCXI demanded that DeSimone and Oldfield turn over, "without deleting or modifying any programs, data, or files located on them, all external hard drives, thumb drives, or other portable storage devices or external media to which your Clients copied files and information from their Company laptops." *Id.*

- The letter reminded O'Brien that his clients had a duty to preserve the data at issue, and specifically directed O'Brien to "**_immediately advise your Clients that they must refrain from any further spoliation of evidence in this matter._**" *Id.*

- Several weeks of wrangling between the attorneys followed, focused on BalanceCXI's desire to have access to the external drives DeSimone and Oldfield had connected to the laptops on April 9, 2019.  *See, e.g.,* Dkt. Nos. 83-17, 83-18.

- On July 30, 2019, BalanceCXI filed this lawsuit in federal court. The Defendants filed an answer on August 26, 2019.  No significant filing activity took place in the suit until BalanceCXI filed the motion to compel on December 16, 2019.  Between August and December, counsel for BalanceCXI negotiated—unsuccessfully—for the voluntary production of the external drives. Ultimately, in late October 2019, BalanceCXI served discovery requests seeking, among other things, production of the relevant devices.

- On November 25, 2019, the Defendants served responses to the discovery, and O'Brien informed BalanceCXI's counsel that the Defendants "are willing to produce the external drives on which they saved their files from their BalanceCXI laptops, pursuant to the forensic protocol that you proposed." Dkt. No. 83-17 at 3.

- On December 16, 2019, with the devices still not having been produced, BalanceCXI filed its motion to compel seeking, among other things, the devices.  Dkt. No. 12.

- At the pretrial conference on December 17, 2019, DeSimone and Oldfield's attorney informed Judge Pitman that he had the external drives, and as soon as the court entered the parties' agreed protective order, he would turn them over to BalanceCXI. Dkt. No. 20 at 5-6.  The protective order was entered the next day, December 18, 2019.  Dkt No. 17.  The Lexar thumb drive and the Western Digital drive were then produced on December 19, 2019.  Dkt. No. 23 at 4-5.  Because the three other drives identified in the forensic report were not produced, BalanceCXI sent a letter on December 20, 2019, demanding that they be delivered immediately.  Dkt. No. 23-6 at 2-3.

- In mid-January 2020, R3 produced a report of its forensic examination of the two drives.  Dkt. No. 83-4.[3]  With regard to the Western Digital drive, the report found that it had been connected to Oldfield's laptop on April 9, 2019, and that after that, the drive was connected to three additional Windows computers. Dkt. No. 83-4 at 1-2.  The forensic expert noted that "any Zacoustic information residing on the WD Drive could have been copied to any or all three of these computers . . . without detection." *Id.*  The last date Oldfield connected the Western Digital drive to another computer was on December 6, 2019, *id.*, the date he gave the drive to his attorney.  Dkt. No. 83-36 at 176-77.

- The report states that while it was connected to Oldfield's BalanceCXI laptop on April 9, 2019, the Western Digital drive had folders on it titled "Z Backup\ZacousticRepo\" and "Z Backup\Downloads\.Zacoustic.com\," but those folders did not exist on the drive when it was analyzed, meaning those folders were deleted after April 9, 2019.  Dkt. No. 83-1 at 3.  "ZacousticRepo" refers to the "Zacoustic Repository," which holds all of the source code for Zacoustic's software, and which is hosted by GitHub on a secure private server.  Dkt. No. 62-8 at ¶¶ 3-8.

- The analysis further showed that at least 190 files and folders were deleted from the "Z Backup" folder that was on the Western Digital drive.  At least 56 of the deleted files and folders on the drive were deleted on or after December 6, 2019.[4]  Dkt. No. 83-1 at 3.

- Oldfield admitted that on December 6, 2019, he ran CCleaner on the Western Digital device before turning it over to his attorney for production. Dkt. No. 83-36 at 186-87.

---

[3]Though it is dated January 13, 2019, the Court assumes this is a typographical error, and that it was actually created on January 13, 2020.

[4]Since the external drives were in the hands of DeSimone and Oldfield's attorney from December 6, 2019, until December 19, 2019, when he gave them to BalanceCXI's attorney, it is reasonable to assume that the deletions took place *on* December 6, 2019.

11

- As noted earlier, the original review of DeSimone's work laptop showed that at least three external storage devices had been connected to that laptop on April 9, 2019. DeSimone only produced one of those for examination—the Lexar thumb drive. The examination of the thumb drive showed that on "December 6, 2019 CCleaner was used to wipe the device." Dkt. No. 83-1 at 2.

- The forensic expert explained that because of the use of CCleaner, for 174 of the files on the Lexar thumb drive that were deleted on December 6, 2019, it is impossible to know what their content was. 173 files on the device, however, had not been wiped with CCleaner, which allowed the recovery of those file names, dates, and other metadata. *Id.* at 11. A review of that information reflects that a number of those files were in a root folder titled "Zacoustic," and another large chunk were in a folder titled "BalanceCXI," with many of those in a subfolder titled "Deliverables." *Id.* at 33, 36. The actual data in these files, however, is not recoverable.

- Oldfield admitted at his deposition that he is the one who deployed CCleaner on the Lexar drive. He stated DeSimone gave him the Lexar drive "when we were both in Dallas working. . . . Because he lives in Philadelphia and I live in Texas, and we needed to produce it. . . it just made sense to hand it to me, and then I gave it to our attorney. . . . [B]efore I turned it over to the courier, I wiped it with CCleaner." Dkt. No. 83-36 at 174.

- There remain at least six devices that were identified by the forensic examiner as requiring analysis which have never been produced by DeSimone or Oldfield, and which they now claim are lost, destroyed or otherwise of no evidentiary value:

  ○ Samsung FIT drive (connected to DeSimone's laptop on April 9, 2019)
  ○ Transcend USB drive (connected to DeSimone's laptop on April 9, 2019)
  ○ A second Western Digital drive (connected to Oldfield's laptop on April 9, 2019)
  ○ Three Windows computers (which were connected to the Western Digital drive between April 9 and December 6, 2019)

- For his part, DeSimone claims he cannot find the Samsung FIT drive, and that he only connected the Transcend USB drive to his laptop for 21 seconds to see what was on it and threw it away as it held no valuable materials. Dkt. No. 83-23 at 2.

- A more detailed examination of Oldfield's laptop revealed that, in addition to the original Western Digital drive, it had also been connected to a second Western Digital drive on April 9, 2019, something Oldfield had not disclosed previously. Dkt. No. 83-1 at 2. Oldfield's explanation in response to this was that in preparing to move files from his laptop on April 9, he connected the laptop to a two-bay USB drive dock he owned. He claims he then retrieved two hard drives from storage, and plugged both into the dock. Oldfield states that he could only access one of the

drives, and the other would not mount, so he did not move any data onto it, and ended up throwing it away. Dkt. No. 68-3.

• With regard to the computers that the Western Digital drive was connected to, Oldfield claims that two of those computers referenced in the forensic report are actually a single computer. He told an elaborate story of having reformatted an old "gaming" computer to give it to his girlfriend's father, and that he had battery problems with it, which led to him discarding it when the cost of a new battery made it uneconomical to replace. Dkt. No. 83-36 at 180-81. He states that two of the three identifiers located by the examiner relate to this computer, one before it was reformatted and one after. Dkt. No. 83-24 at 3. He never explained what his purpose was in connecting the computer to the Western Digital drive before and after reformatting it.

• When asked if he had made a backup of the drive of this computer before he reformatted it, Oldfield stated he had not, and explained that "I just didn't care about it. And I – I was – I was pretty stressed out and I just needed to get some stuff done. And yeah, I just formatted it." Dkt. No. 83-36 at 181. When he later discarded the laptop, Oldfield removed the hard drives and physically destroyed them. *Id.* at 182.

• The last computer identified by the examiner is Oldfield's current laptop, which DeSimone purchased for him after Oldfield returned his previous laptop to BalanceCXI in April 2019. *Id.* at 181. He testified that he reformatted that computer on January 3, 2020, in an attempt to resolve a problem he was having with the taskbar. *Id.* at 183. He claims that he did not make any backup of the data on the computer before reformatting it, and thereby deleted all of the data on the laptop in that process. *Id.* at 184. He also testified that he got the computer in roughly July 2019, because he "needed a laptop" and it was paid for by DeSimone or ICAR. *Id.* Despite this, he claimed that he "really hadn't used the laptop very much," and when asked "Is it unusual to not make a backup of a computer before you delete all the information on it?" he stated, "No. And certainly not for me. It's very typical for me. I don't – I don't generally make a backup of anything except from [sic] my photos." *Id.* at 185.

• In sum, Oldfield's testimony was that, despite owning the laptop for nearly six months, and apparently using it for ICAR-related work (and despite having spent hours culling information from his company laptop in April 2019 before relinquishing it), in January 2020 he reformatted his new computer without keeping a single file that had been on it previously, all to fix a problem with the Windows taskbar.

• Interestingly, on January 2, 2020, the day before this happened, Oldfield's attorney informed BalanceCXI that he would explore with Oldfield and DeSimone the

existence or whereabouts of any additional relevant storage devices or computers so they could be examined if necessary.  Dkt. No. 83-20.

• If Oldfield had copied BalanceCXI proprietary data from his work laptop to the Western Digital drive, and then copied the data from the Western Digital drive to his current laptop, by reformatting that laptop on January 3, 2020, he permanently eliminated any evidence that data had been on that machine.

• Thus, despite being told from the outset they were to return their computers "as is" and with no alterations, DeSimone and Oldfield immediately disregarded that instruction, and at every turn they have taken affirmative steps to destroy, delete and wipe data, first from their laptops, and then from the many devices they transferred data to from those laptops.  Twice, on the eve of turning devices over to BalanceCXI, they used software to permanently wipe data from the devices.  Oldfield also twice reformatted laptops to which he had connected the primary storage device he used. Not once did DeSimone or Oldfield disclose what they had done, and it was only through the forensic examination of the devices that BalanceCXI learned the little that it does know regarding their actions.

• The Defendants claim that their only concern was to remove personal data from their company laptops, yet during that process both of them spent considerable time going through folders containing BalanceCXI's proprietary data, both attached storage devices to their laptop and created folders with similar or identical names to those holding BalanceCXI's data, and both then wiped all evidence of what they had copied.

• While their actions on April 9, 2019, took place before any lawsuits had been filed, their own attorney had issued a "litigation hold" notice to BalanceCXI that morning, so the Defendants plainly anticipated litigation when they destroyed this evidence. And if any more clarity were needed, their destruction of evidence on December 6, 2019, and Oldfield's reformatting of two computers before and after that date all took place  after this lawsuit was filed, in the midst of discovery, well after there could have been any lack of understanding of their obligation to preserve evidence.  Finally, their explanations of why they deleted material from the computers do not hold up to scrutiny, and, in Oldfield's case, are just plain outlandish.[5]

_____

[5]Two examples demonstrate the nature of his testimony:

• When he was confronted with a list of all of the files he accessed before returning the computer—folders that held the Zacoustic source code, and similar proprietary data—Oldfield claimed that he perused them to make sure there wasn't any of his personal data stored there. Dkt. No. 83-36 at 104 ("the only reason I would be going through this stuff is because I thought maybe I saved something here for

•     An illustrative exhibit submitted by BalanceCXI at the hearing aptly depicts how these actions have prevented BalanceCXI from learning what the Defendants copied from their work laptops, and what they did with that data.



| Device Key | | |
|---|---|---|
| A. DeSimone's Company Laptop | F. | Returned Lexar Device |
| B. Oldfield's Company Laptop | G. | Returned WD Device |
| C. Transcend USB | H. | Hidden WD Device |
| D. FIT USB | I. | "Gaming" Laptop |
| E. Generic USB | J. | Oldfield's Current Laptop |

•     BalanceCXI did not offer any evidence that Oldfield or DeSimone engaged in the conduct described above on behalf of ICAR, that ICAR has made any use of BalanceCXI's trade secrets in its business, or that there is any evidence even suggesting ICAR has done so.

---

myself at some point, and I just wanted to check because I didn't want to return the laptop with any [personal data])."  To believe this, one would have to believe Oldfield, the Chief Technical Officer of the company, routinely placed his own personal data—phone backups, photographs, and tax returns—in folders containing items like the company's software source code.

•     Repeating a claim he made often, he asserted he was distracted and "stressed" when he was preparing to return the laptop:  "I literally was up all night trying to get my stuff off, get it deleted from the company laptop before I surrendered it to the courier . . . .  It  was a  frantic event, and I was pretty heavily intoxicated." Dkt. No. 83-36 at 103.  The forensic evidence, however, shows that the activity took place in the late morning to mid-afternoon on April 9.  Dkt. No. 83-2 (showing the Western Digital external hard drive was connected to the laptop on April 9, 2019, at 10:26:08 AM and at 1:15:08 PM).

## IV. Legal Analysis

**A.      Introduction**

BalanceCXI requests that the Court sanction DeSimone and Oldfield for their failure to comply with the Court's order on the motion to compel, and for their destruction of evidence.  In addition to the "death penalty" sanction of default judgment or striking of the answer, it asks that the Court order the Defendants to pay BalanceCXI's fees and costs incurred on the motion to compel and the motion for sanctions.  Defendants' primary response is that they are working to comply with the discovery requests and that the request for sanctions is overkill.[6] They assert that BalanceCXI is attempting to "weaponize discovery" to win at this phase of litigation because its actual case is not very good.  Additionally, Defendants point out that they sued BalanceCXI first (in Texas state court) and suggest this suit is just a countermeasure filed by BalanceCXI for strategic purposes.

Throughout the motion to compel, BalanceCXI refers to, and asks for sanctions against, "the Defendants" collectively.  But as noted in the Court's final finding of fact, there is no evidence that DeSimone or Oldfield's actions regarding their computers were taken on ICAR's behalf, or that ICAR benefitted from those actions. The burden of proof is on BalanceCXI on the motion for sanctions, and it has failed to carry that burden as to ICAR.  The Court's focus will therefore be limited to DeSimone and Oldfield only. (Any reference to "the Defendants" in what follows includes only DeSimone and Oldfield, not ICAR.)

**B.      Standard**

Federal Rule of Civil Procedure 37(b)(2)(A) "allows a district court to impose a sanction when a party fails to comply with a discovery order, and the court has broad discretion in fashioning

---

[6]The Court already  rejected their failure to confer argument.  Dkt. No. 71 at 2.

16

its sanction when it does so." *Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019), as revised (June 6, 2019). The rule provides a host of possible sanctions, including "litigation-ending sanctions." FED. R. CIV. P. 37(b)(2)(A)(iii) & (vi); *Munoz*, 924 F.3d at 758. Severe sanctions are warranted when the conduct is willful or in bad faith, the client is the responsible actor, the opposing party was substantially prejudiced, and any lesser sanction would not achieve the requisite deterrent effect. *Munoz*, 924 F.3d at 758-59. Sanctions may also include an award of attorney's fees. "Under Rule 37(b)(2)(C) . . . a party may be personally liable for reasonable expenses including attorney's fees caused by the failure to comply with a discovery order." *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 516 (5th Cir. 1985). "[T]he assessment of attorney's fees is penal in nature; it is designed to penalize those who engage in the charged conduct and to deter others who might be tempted to follow in similar conduct." *Id.* Rule 37 "provides that only those expenses, including fees, caused by the failure to comply may be assessed against the noncomplying party," and that those expenses must be reasonable. *Id.*

BalanceCXI has also offered evidence of spoliation, which is governed by Rule 37(e). That subsection provides:

> [i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1)    upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2)    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A)    presume that the lost information was unfavorable to the party;

> (B)    instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C)    dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e). Finally, when spoliation occurs before a case is filed, or in a manner not addressed by the current rules or statutes, a court has the inherent authority to sanction the conduct apart from Rule 37. *See, e.g., Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010) ("Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed in federal courts through the inherent power to regulate the litigation process if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct.").

## C.    Failure to comply with a court order

The first ground for sanctions BalanceCXI raises is the argument that the Defendants' failure to disclose devices and surrender them for inspection violated the Court's March 2020 order on the motion to compel.  The Court need not spend a great deal of time on this argument, given that virtually all of the Defendants' misconduct predated that order and therefore could not have violated it.  Thus, though they have definitely been bad actors, the Defendants' misconduct does not appear to have violated the March 13, 2020 order.  BalanceCXI's argument is focused on the Defendants' failure to produce for inspection the additional devices identified by the forensic examination, which it contends ran counter to the admonition the Court gave the Defendants in its order, when it notified the Defendants that if the forensic examination of the storage devices they had turned over for examination, "reveals that other devices may have been involved in the transmission, storage, or alteration of BalanceCXI's data that was contained on the company laptops, actions taken to impede or delay the production of those devices will not be tolerated."  Dkt. No. 46.  The language of the

18

order makes plain that the Court was not *ordering* the production of any devices here (since the identity of the devices was not known yet), but instead was giving the Defendants a warning about their future conduct. Moreover, the specific devices BalanceCXI complains were not turned over are the devices that allegedly no longer exist—the Samsung FIT drive, the generic USB drive, the second Western Digital drive, and Oldfield's "gaming" laptop. The Defendants have submitted amended, sworn interrogatory responses stating that they destroyed or discarded all of these devices, (save the generic USB drive which DeSimone states he cannot locate).[7] Thus, even if the order is read as a directive to produce these devices, the Defendants cannot produce what they do not have. Accordingly, the Court concludes that the Defendants did not violate the March 13, 2020 order.

## D.  Spoliation

The situation is distinctly different with regard to the spoliation of evidence. To recap, four predicate elements must be established before a court grants sanctions under Rule 37(e): a party was (1) obligated to preserve ESI (2) but did not do so (3) because they failed to take reasonable steps to preserve it, and (4) the ESI cannot be restored or replaced. FED. R. CIV. P. 37(e); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2019 WL 4738915, at *1 (W.D. Tex. Sept. 27, 2019). If these elements are established, the Court must determine what the appropriate responsive measures are. The most severe sanctions are only permitted when additional findings under Rule 37(e)(2) have been made. Those findings require the court to determine if the ESI was lost or destroyed "with the intent to deprive another party of the information's use in the litigation."

---

[7]Oldfield's current laptop may also fall into this category, since he connected the Western Digital drive to it on December 6, 2019. But since he reformatted that computer a month later, and deleted all of its data, it is likely of no evidentiary value. Moreover, for the reasons set out in the section that follows, the computer is likely no longer relevant even if it did have some remaining useful data on it.

If so, the Court may consider three additional sanctions: (1) a presumption that the lost information was unfavorable to the destroying party; (2) an instruction to the jury that it may or must presume the information was unfavorable to the destroying party; or (3) the dismissal of the action or entry of a default judgment. FED. R. CIV. P. 37(e)(2).

There is little question that there is evidence of the four fundamental elements required by Rule 37(e). First, beginning when they left BalanceCXI with their work laptops still in their possession, and continuing through at least January of 2020, DeSimone and Oldfield were in possession of a substantial amount of ESI that was relevant to this dispute.  Likewise, there is little doubt that at least by April 9, 2019, they were obligated to preserve this ESI.  O'Brien's email on the morning of April 9, 2019, contained a "litigation hold" warning, informing *BalanceCXI* that it had a duty to preserve electronic evidence given the existence of a "potential formal legal dispute." Dkt. No. 83-14 at 3.  Certainly if DeSimone and Oldfield thought BalanceCXI needed to preserve electronic evidence, then the same duty applied to them as well.  *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (party has a duty to preserve evidence "when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant); FED. R. CIV. P. 37(e) (the duty to preserve relevant evidence includes doing so "in the anticipation . . . of litigation . . .").  That ESI has been lost and cannot be replaced is also not in dispute.  Both of the detailed forensic reports (Dkt. Nos. 83-1 & 83-4) note that a substantial amount of data on numerous devices is unrecoverable due to its having been intentionally deleted or destroyed with CCleaner software.  DeSimone and Oldfield also admitted to throwing out one external storage drive each, and Oldfield admitted he reformatted or destroyed two potentially relevant laptop computers.  Thus, Rule

37(e) plainly applies here.  The real question is whether the evidence also fulfills the criteria of Rule 37(e)(2).[8]

Based on the facts recited in detail above, this is that rare case in which the most severe sanction is warranted.  Discovery in civil litigation takes place largely on faith—the faith that each party will voluntarily provide all relevant and responsive evidence to its opponent, even when that evidence is prejudicial to the producing party's case.  It would be prohibitively expensive, if not impossible, for a judge or discovery master to monitor every stage of discovery in every civil case to ensure parties fulfill these obligations honestly.  Thus, when a party not only fails to meet his obligation to preserve evidence, but does so intentionally, and, as here, affirmatively destroys evidence *multiple* times, the sanction must be severe, as civil litigants must know that actions such as these will not be tolerated, lest more parties engage in them.  Further, as set out below, the destruction of evidence in this case has made it nearly impossible for BalanceCXI to gather the evidence it needs to prove its case, and any lesser sanction would reward the Defendants' actions.[9]

---

[8]BalanceCXI's briefing contends that the Defendants' actions were committed both "in bad faith" and with the "intent to deprive" it of evidence.  It is not clear that a finding of "bad faith" is required under Rule 37(e)(2).  Before the 2015 amendment to the rule, the Fifth Circuit generally "permit[ted] an adverse inference against the destroyer of evidence only upon a showing of bad faith or 'bad conduct.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015).  The 2015 version of Rule 37(e) does not mention "bad faith" and instead requires a showing that the party at fault acted with the "intent to deprive another party of the information."  As one district judge has noted, since the adoption of Rule 37(e)(2), the "Fifth Circuit has not clarified whether its prior spoliation jurisprudence has been abrogated or otherwise amended pursuant to the amendment of Rule 37(e)." *Barnett v. Deere & Co.*, 2016 WL 4544052, at *2 (S.D. Miss. Aug. 31, 2016).  In this case, that question is largely academic, however, because, as discussed in what follows and in the fact findings, there is no question that the Defendants' actions were taken in bad faith, since they knowingly and intentionally destroyed evidence they were obligated to preserve.

[9]Rule 37(e) does not require a showing of prejudice when the heightened findings required by section (e)(2) have occurred.  As the Committee Notes to the 2015 Amendments state,

Because the fact findings detail the serial spoliation the Defendants engaged in, the Court will not repeat that evidence here, but will instead summarize and highlight the most important findings. First, from the very outset Oldfield and DeSimone were instructed to return their work computers *without alteration*.  The employee manual they agreed to mandated this, and made it clear that all information on the computers—whether personal or work—was the property of their employer.  And they were not just "line" employees of the company.  DeSimone was the COO and Oldfield the Chief Technical Officer, and thus, in a very real sense, they were the very officers who would be expected to enforce these policies.  And if they were uncomfortable with leaving personal information on the computers when they returned them, the assurance from BalanceCXI's attorney that he would work with their attorney once the computers were returned to address any personal information on the laptops should have assuaged their fears.  The evidence shows that, despite these instructions, once they knew they were going to have to give the laptops back to BalanceCXI, they immediately tampered with them.[10]  Further, despite contending that their intentions were innocent—that they

---

Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.

FED. R. CIV. P. 37(e), Advisory Committee Notes to 2015 Amendments.  And even if prejudice were required, there is no doubt BalanceCXI has shown it.  Its theft of trade secrets and related claims are based on DeSimone and Oldfield retaining BalanceCXI data after leaving the company. What BalanceCXI learned from the forensic examination of the laptops was more than enough to support the filing of the theft claims contained in this suit.  The evidence it needed to prove those claims was contained first, on the laptops, and next on the external drives—the very ESI that DeSimone and Oldfield destroyed.  All of BalanceCXI's theft related claims have thus been prejudiced.

[10]DeSimone and Oldfield's attorney at the time did give them the questionable instruction to violate their employee policy and remove "purely personal" material from the laptops, but he

were only trying to remove "personal" information from the computers—the forensic analysis shows that while they had external storage devices connected to their laptops, both of them spent considerable time perusing BalanceCXI's proprietary information, and creating new folders on their desktops or storage devices with names like "Zacoustic/Repo" and "Zacoustic Backup," names BalanceCXI uses to refer to its source code and other proprietary information.

Most troubling, when they were caught at this, and eventually (and reluctantly) turned over storage devices that had been connected to the computers, they doubled down on their actions. The evidence shows that they tampered with those drives before surrendering them for examination, and used data wiping software once again, permanently deleting hundreds of files from the drives. These actions prevented BalanceCXI from determining what had been on the drives before that time, and determining whether DeSimone and Oldfield had copied data from *those* devices to yet other devices before they were surrendered. Finally, Oldfield effectively killed any remaining trail by destroying all of the evidence from the two computers he had connected the Western Digital drive to before he turned it over. He twice reformatted one of the computers, and then removed its hard drives and physically destroyed them. As for the other computer—which he had been using for work for six months in his current employment—he went to the extreme length of deleting 100% of the data on it and reformatting it without keeping a backup.

There is only one reasonable conclusion from these actions: after leaving their employment, it is highly likely that the Defendants did in fact copy BalanceCXI's data from their company laptops

---

expressly directed them to segregate and preserve anything they removed, in case they needed to demonstrate what they had done. DeSimone ad Oldfield both admit that they ignored that portion of the instruction. In fact, far from making sure to preserve the evidence of what they had done, they instead used "wiping" software to *destroy* that evidence.

onto storage devices and retain it after returning the laptops.  Because of the Defendants' destruction of evidence, however, there is currently no way of knowing whether they still have any of that data, or whether, in an attempt to hide their actions, they finally deleted or destroyed all of it.  But whether they actually committed the theft of BalanceCXI's trade secrets is not something the Court needs to determine for the purposes of this motion.  What is beyond any doubt is that both DeSimone and Oldfield destroyed a substantial amount of electronically stored information relevant to that claim, that they did so intentionally, and that they did so for the purpose of depriving BalanceCXI of that information for use in this litigation.  Given the seriousness of their actions, and the sheer number of devices they wiped, destroyed, or "lost," this is a case where it is readily apparent that the most serious sanction is warranted.

The case law supports this conclusion. For example, in *Moore v. CITGO Ref. & Chemicals Co., L.P.,* 735 F.3d 309, 317-18 (5th Cir. 2013), the Fifth Circuit upheld the district court's dismissal of a case where the plaintiffs deleted emails or failed to preserve inbox contents, as the destroyed ESI may have been essential to the defendant's defense.  In a case from the Southern District of Texas, a district court entered death penalty sanctions for a party's purposeful physical damage to a memory storage unit, which rendered the history of data transactions unrecoverable, and their reformatting of laptop computers, as the court concluded that these acts had prevented the opposing party from proving their case. *Arya Risk Mgmt. Sys., Pvt. Ltd. v. Dufossat Capital Puerto Rico, LLC,* 2019 WL 6840395, at *8 (S.D. Tex. Aug. 22, 2019), report and recommendation adopted, 2019 WL 4686575 (S.D. Tex. Sept. 26, 2019).

The lesser sanctions of Rule 37(e)(2)(A) and (B) would not be sufficient to address the conduct of the Defendants, nor the harm they caused.  First, as noted, Oldfield and DeSimone's

actions were egregious.  It is hard to imagine a more pernicious pattern of evidence destruction. The Defendants deleted evidence multiple times, did so intentionally, and did so despite knowing they had a duty to preserve the evidence.  Further, the evidence they destroyed was not peripheral to the case—it went to the very heart of BalanceCXI's trade secret claims, and likely would have proven or disproven those claims.  All of this supports death penalty sanctions.  "[A] terminating sanction is justified in only the most egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives." *Quantlab Techs. Ltd. (BGI) v. Godlevsky*, 2014 WL 651944, at *9 (S.D. Tex. Feb. 19, 2014) (citing *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F.Supp.2d 456, 469-70 (S.D.N.Y.2010), abrogated on other grounds by *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012)).  In similar circumstances, courts have awarded case-terminating sanctions.  *See TLS Mgmt. & Mktg. Services, LLC v. Mardis Fin. Services, Inc.*, 2018 WL 3673090, at *6 (S.D. Miss. Jan. 29, 2018) (granting death penalty sanctions where parties wiped computers with CCleaner in the middle of a lawsuit).  As the *TLS* court noted, under Rule 37(e) the punishment should fit the crime, and the "measure of that crime is not the harm to the opposing party, but is rather the severity of data destruction." *Id.*  "[D]efault judgment is appropriate only when 'destruction of evidence was of the worst sort: intentional, thoroughgoing, and (unsuccessfully) concealed.'" *Id.* (quoting *Gutman v. Klein*, 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008), report and recommendation adopted, 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008)).  That is exactly the situation here—the Defendants' actions were intentional, repeated, concealed, and addressed to as many as ten separate devices. A lesser sanction would have less of a deterrent effect, and would

not punish the Defendants in a manner proportionate to the severity of their actions. *Id.*[11]  The Court

therefore recommends that a default judgment be entered against the Defendants on all of the theft

of trade secrets claims.[12]

### E.      Attorneys' Fees

BalanceCXI also requests that it recover from Defendants the attorneys' fees and costs it

incurred in filing the earlier motion to compel and in filing and prosecuting this motion.  Rule 37(a)

states:

> If [a motion to compel] is granted—or if the disclosure or requested discovery is
> provided after the motion was filed—the court *must*, after giving an opportunity to
> be heard, require the party or deponent whose conduct necessitated the motion, the

---

[11]Given the centrality of the evidence that was destroyed, it is not even clear that a lesser sanction would lead to a materially different result than a default judgment.  To be specific, either permitting or directing a jury to infer that the evidence destroyed would have been adverse to the Defendants would mean that the jury was to infer that the destroyed data were BalanceCXI's source code and trade secrets.  If the jury is instructed to assume this, then this means the jury has to conclude that DeSimone and Oldfield were in possession of BalanceCXI's trade secrets well after their employment, and transferred that data from device to device to hide it from BalanceCXI as it tried to recover the data.  Though this is not a default judgment, it is difficult to see how a jury could *not* find the Defendants liable on the theft of trade secrets "family" of claims with such an inference.  But, because the instruction is not given until trial, imposing such a sanction would have the negative consequence of prolonging the inevitable while increasing the costs for all parties.

[12]BalanceCXI states seven separate claims in its Complaint.  Dkt. No. 1.  Five of these are based on the factual allegations directly impacted by the destruction of the electronic evidence—the claim that DeSimone and Oldfield copied BalanceCXI's proprietary data from their laptops, and kept that data after returning the computers.  Those causes of action are Misappropriation of Trade Secrets under state and federal law (Counts 1 and 2), Conversion (Count 5), Civil Conspiracy (Count 6), and violation of the Computer Fraud and Abuse Act (Count 7).

On the other hand, there is no evidence before the Court to suggest that the Defendants' spoliation destroyed any evidence related to the two other claims, which allege that DeSimone and Oldfield violated their non-compete and non-solicitation agreements (Counts 3 and 4).  Thus, a default judgment should not be rendered on those two causes of action.  Further, the default judgment should only be as to liability, as BalanceCXI has not presented any evidence at this point regarding the damages it claims the theft of trade secrets has caused it.

party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.

FED. R. CIV. P. 37(a)(5) (emphasis added).  Courts also routinely award attorney's fees and expenses under Rule 37(e), to cover the time and effort necessary to bring the issue of spoliation before the court.[13]  *See, e.g., Experience Hendrix, L.L.C. v. Pitsicalis*, 2018 WL 6191039 at *11 (S.D. N.Y. Nov. 27, 2018); *John v. County of Lake*, 2020 WL 3630391, at *8 (N.D. Cal. July 3, 2020); *Borum v. Brentwood Vill., LLC*, 2019 WL 3239243, at *10 (D. D.C. July 18, 2019); *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288, at *14 (M.D. Fla. Oct. 28, 2019).

At the end of the hearing on BalanceCXI's motion to compel in March 2020, the Court stated that it believed an award of attorneys' fees was warranted by the Defendants' actions up to that time, and reiterated this in the order following the hearing:

> the conduct of the Defendants regarding their laptops documented in the evidence now before the Court is very concerning. Coupled with the difficulty BalanceCXI has had in obtaining the production of records, and the fact that very little was produced until immediately prior to the Court's hearing, the Court believes an award of fees is likely justified. Further, the Court believes the award would properly be made against the Defendants, based on the presently available information. The Court, however, will reserve ruling on that issue until the discovery mandated by this order has taken place. When that discovery is complete, BalanceCXI shall notify the Court. The Court will at that time issue a schedule for any additional briefing on the issue the parties may wish to submit.

---

[13]As several commentators and judges have noted, Rule 37(e) itself is silent on the issue, and the Advisory Committee said nothing on the topic when the 2015 amendments were adopted. Commentators generally consider the silence an "oversight," with one court describing it as "shocking." Steven Baicker-McKee, *Mountain or Molehill?*, 55 DUQ. L. REV. 307, 321 (2017) (the silence "seems like an oversight"); *Snider v. Danfoss*, No. 15-CV-4748, at *5 (N.D. Ill. July 12, 2017) ("the Advisory Committee Notes are shockingly silent on the issue as well.").  Despite the silence, the weight of authority is that fees are awardable as part of a Rule 37(e) sanction.  Thomas Y. Allman, *Dealing with Prejudice: How Amended Rule 37(e) Has Refocused ESI Spoliation Measures*, 26 RICH. J.L. & TECH. 1, 92 (2020).

.

Dkt. No. 46 at 9.   The advisory filed by BalanceCXI on April 17, 2020, was the notification mentioned in the order, after which the Court directed BalanceCXI to file a specific motion for sanctions if it was seeking them.   The present motion followed.

Starting with the motion to compel, an award of fees is plainly appropriate, for all of the reasons stated at the hearing and in the order granting that motion.   Dkt. No. 46.   The Defendants dragged their feet in responding substantively to the discovery, and particularly in identifying and producing relevant electronic storage devices.   It took the Court setting a hearing on the motion for them to finally produce some of the devices, and yet, even in that act, they went astray, deleting substantial amounts of data from the devices before turning them over.   The Court will therefore order that DeSimone and Oldfield pay BalanceCXI the amount it has expended in attorneys' fees related to the briefing and arguing of the motion to compel (Dkt. No. 12).

With regard to the motion for sanctions, the Court will also award BalanceCXI its fees and expenses.   As already described, DeSimone and Oldfield's actions are some of the most extreme examples of spoliation of evidence the undersigned has witnessed in his 21 years on the bench. Their actions and their lack of transparency required that BalanceCXI hire a forensic specialist, and expend a significant amount of legal resources just to identify what the Defendants had done to the ESI that was on their laptops and other devices.   None, or very little, of this work would have been necessary had Defendants turned over their computers unaltered, and a good deal of it would have been unnecessary if Defendants had not stalled in producing the storage devices, and handed them over unaltered.   Thus, the costs BalanceCXI incurred in filing and prosecuting the motion for sanctions, including the costs of the forensic expert, are directly attributable to the Defendants' spoliation of evidence.   An award of these fees and expenses is therefore appropriate.

## V.  Recommendation

For the reasons set forth above, the undersigned **RECOMMENDS** that the Court **GRANT**

Plaintiff BalanceCXI, Inc. d/b/a Zacoustic's Motion for Rule 37(b) Discovery Sanctions (Dkt. No.

66) and:

(1)     enter a default judgment as to liability against DeSimone and Oldfield on Counts 1,
        2, 5, 6, and 7 of the Complaint (Dkt. No. 1); and

(2)     order that Oldfield and DeSimone, jointly and severally, pay BalanceCXI the
        attorneys' fees and expenses it incurred in filing and arguing the Motion to Compel
        (Dkt. No. 12) and the instant motion (Dkt. No. 66), and direct the parties to comply
        with Local Court Rule CV-7(j) to identify those fees, starting with BalanceCXI
        submitting its application or the parties' agreement within 14 days of the date the
        District Court acts on this Report and Recommendation.

SIGNED this 24th day of November, 2020.

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE